LONDON *v*. STATE.

4269                                        164 S. W. 2d 988

Opinion delivered October 12, 1942.

*Claude F. Cooper* and *T. J. Crowder*, for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, C. J.   June 8, 1941, "Chick" Collier and "Whitey" Guthrie robbed Norwood Hedge of approximately $500 and valuable jewelry. Hedge, who occupied an upstairs apartment in Blytheville with his wife, was forced at pistol-point to surrender his property. The house was searched for additional money, Guthrie and Collier having been told that Hedge (operator of a drinking place known as "Sailors' Bar") ordinarily carried $14,000 in a money belt.

When apprehended, Guthrie and Collier confessed and subsequently entered pleas of guilty. Appellant was also charged with the crime, but denied complicity. He appeals from conviction and a judgment of three years in prison. Sufficiency of the evidence and an instruction are challenged.

Prior to the robbery Guthrie "cased" Hedge's place, having been driven by Parker Morgan from Sikeston, Missouri, to Blytheville.

Guthrie, who at odd times had worked for London as a taxicab driver, testified that on the day Hedge was robbed he (Guthrie) called London at Sikeston directing contact with Collier at Dexter, and that they procure "artillery" and join him at Caruthersville. Guthrie's statement to London was that he "had something good" and wanted it attended to. London and Collier reached Caruthersville between two and three o'clock in the afternoon. A "forty-four" and a "thirty-eight" pistol were in the cowl compartment of London's car when he reached Caruthersville. Parker Morgan and Guthrie had discussed all phases of the proposed robbery, and in London's presence Guthrie told Collier what Morgan had said. The agreement was that after deducting ten percent for Morgan the remainder would be divided three ways— between Guthrie, Collier, and London. Other testimony given by Guthrie further connected London with the crime.

It is argued that Collier denied London's participation. While Collier's purpose was to shield his associate, his testimony condemned more than it protected. He admitted London informed him Guthrie called on the tele-

phone, directing the rendezvous at Caruthersville. His explanation is that after contacting Guthrie, the latter remarked that they would "take a drive to Blytheville." Collier contends that at that time he did not know what Guthrie's purpose was. On the way to Blytheville the Hedge robbery was mentioned, and the witness (Collier), after consenting to the plan when told it would yield $10,000, urged that the stick-up be consummated at Sailors' Bar "because I had been informed Hedge was married, and I always make it a practice not to steal from women."

After the three had eaten at a Blytheville restaurant, Guthrie went to a telephone booth. Hedge was pointed out to Collier, and thereafter they "killed time" until after dark. When Hedge finally left the bar in an automobile Collier told London, who was driving, to follow. Hedge drove to his home. Collier and London went back to town and got Guthrie. The three returned to a point near the Hedge home and the taxicab was parked in a side street. London remained with the cab while Guthrie and Collier robbed Hedge. Guthrie was then taken to Caruthersville and Collier "went home." "We divided the money in the car. . . . The man (presumably Hedge) told me that he had five hundred dollars. Guthrie wanted the money belt. I figured we got $200. Hedge said Guthrie stole some money and Guthrie handed me some. . . . I got in the back seat, with Guthrie in front."

There was the further explanation that at the time Hedge was robbed, Guthrie took all the money. The first time Collier saw the "take" was when Guthrie began dividing. Guthrie's pistol was in the front seat beside him. Collier testified that in apportioning proceeds, Guthrie "would take so much and give me so much." Question: "Did London get some?" Answer: "I wouldn't say. . . . I got in the back seat [and kept] looking back to see if any cars were following us." Question: "Did Guthrie hand your money to you over the back seat?" A. "Yes." Q. "Were you confident that when [Guthrie] took a twenty you would get a twenty:

did he tell London that, too?" A. "I didn't hear that. He probably got it. I saw money transferred from London to Guthrie. London asked for money. . . ." Q. "If you could hear [the statement that Morgan, the 'finger man'] ought to get ten percent, London could hear it?" A. "Yes."

Otto Scrape, a young farmer residing near Blytheville, testified that he was working in his father's tractor shed near Highway 61 when a 1941 Chevrolet automobile with Missouri license number 165,275 parked on the roadside between 6 :30 and 7 :00 o'clock the evening of June 8. It was good daylight. Thinking the car contained a "petting pair," the witness decided to ask them to move on. He approached by way of a low fence, shielded by bushes, stopping about ten feet from the Chevrolet:—"When I got within hearing distance they were talking about the police. I kept hidden to hear what they were saying. . . . The man under the wheel (later identified by Scrape as London) was listening and the others were talking. . . . One of the men was Guthrie. . . . The men 'outside' were talking. The only one I saw in the car was Jack [London], and I figured they were talking to him." Question: "What was the conversation you heard?" Answer: "They were planning to take a route into Missouri so that in going through they could get around the 'cops.' The rest of the road was not patrolled. . . . That was my understanding." Question: "Was anything said about Kennett, Missouri?" Answer: "It was Kennett, or some place they said was a 25-mile stretch. He said they could take one road after they hit Hayti and the only time he would worry was while they were driving the 25-mile stretch between here. . . . I took the license number at the time and wrote it down. . . . I told my Dad what I saw and what they said, and we decided to go to the police."

Appellant contends he was merely an innocent, non-suspicious taxicab driver. The explanations and disavowals, however, were not believed by the jury. It is insisted that Guthrie's testimony is worthless because

he had served nearly fourteen years in penitentiaries, "and has many years to go." At the time of trial he was thirty-six, and had received prison sentences for burglary and robbery aggregating seventeen years. Collier, likewise, had served time for robbery. He and Guthrie met and became friends while in prison.

Enough of the state's evidence has been set out to show that appellant was not convicted upon the uncorroborated testimony of an accomplice. London's admission that he brought Guthrie and Collier to Blytheville; that after Hedge had been identified he and Collier followed him home; that they returned to town and got Guthrie, and that the taxicab was parked at a convenient point; Scrape's identification of car and parties and his narration of conversations by the roadside—these facts and other evidence it is not necessary to refer to were sufficient to go to the jury, and they warranted conviction.

It is insisted that prejudice resulted from an instruction which told the jury the defendant would be guilty if he . . . "were either standing by, aiding, abetting, assisting, or encouraging commission of the crime," . . . [and] "even though not actually present, [if he] aided, abetted, assisted, or encouraged perpetration of the crime," he would be guilty.

Appellant's theory is that prosecution was under § 2934 of Pope's Digest:—"An accessory is he who stands by, aids, abets, or assists, or who not being present . . . hath advised and encouraged the perpetration of the crime."

It was necessary, says appellant, for the state to show that he had, prior to the robbery, advised and encouraged its commission. It is conceded that if appellant had stood by, "aiding, abetting, or assisting," he would be guilty; or, if not present, if he advised and encouraged those who robbed Hedge, guilt would attach. See, also, *Fleeman and Williams* v. *State, post* p. 772.

Initiated Act No. 3 (p. 1384, Acts of 1937) deals with accessories and principals. Section 25 is: "The distinction between principals and accessories before the

fact is hereby abolished, and all accessories before the fact shall be deemed principals and punished as such. In case of felony, when the evidence justifies, one indicted as a principal may be convicted as an accessory after the fact; if indicted as an accessory after the fact, he may be convicted as principal."

Information filed by the prosecuting attorney charged London with robbery. He was treated as a principal. This was not error. If Scrape's testimony is to be believed (and it was, and appears entirely credible), London was bound to have known he was transporting robbers who for escape relied upon use of his car. Having been informed of Guthrie's and Collier's designs, appellant's act in transporting them to a point near Hedge's home, and in standing by to aid their escape, involved him to the same extent as though he had gone upstairs with his associates and had physically participated in the robbery. He was present, "aiding, abetting, and assisting."

If Guthrie's testimony is correct, appellant procured the pistols. Collier's languid effort to convince the jury that London did not understand what any man of ordinary intelligence and perception would have inferred from circumstances, acts, and conversations, adds but little to appellant's contention that in effect he was deaf, dumb, and blind.

Affirmed.